# United States Court of Appeals
## For the First Circuit

No. 15-1239

UNITED STATES OF AMERICA AND COMMONWEALTH OF MASSACHUSETTS,
EX REL. MICHAEL A. WILLETTE,

Plaintiff, Appellant,

v.

UNIVERSITY OF MASSACHUSETTS, WORCESTER
a/k/a UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL,

Defendant, Appellee.

ESTATE OF LEO VILLANI AND JOHN DOES,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Barron, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

Allyson H. Cohen for appellant.
Daniel Meron, Special Assistant Attorney General,
Commonwealth of Massachusetts, with whom Latham & Watkins LLP was
on brief, for appellee.

_____

*Hon. David H. Souter, Associate Justice (Ret.) of the Supreme
Court of the United States, sitting by designation.

---

January 27, 2016

---

SELYA, **Circuit Judge**.  This appeal raises two distinct but loosely connected issues.  The first involves the question of whether the University of Massachusetts Medical School (UMMS) is a state agency, not a "person," and therefore exempt from suit by private parties under the False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, and its Massachusetts counterpart, Mass. Gen. Laws ch. 12, §§ 5A-5O.  The second involves the operation and effect of Federal Rule of Civil Procedure 54(b).

With respect to the first question, we settle upon the appropriate test (a matter of first impression in this circuit), conclude that UMMS is an arm of the state, and hold that the district court did not err in dismissing the relator's claims against it.  With respect to the second question, we conclude that Rule 54(b) must be construed strictly.  As a result, we dismiss the relator's attempt to raise on appeal issues not fairly presented in the district court's Rule 54(b) certificate.  The tale follows.

## I.  BACKGROUND

Plaintiff-appellant Michael A. Willette (the relator) toiled at UMMS for roughly fourteen years beginning in 2000. Specifically, he worked for the Center for Health Care Financing (CHCF).  One of CHCF's chief tasks is the recovery of funds from third parties (such as private insurers or the estates of deceased beneficiaries) in order to reimburse Medicaid expenditures

previously made by the Commonwealth of Massachusetts and the federal government.

CHCF is an office within a division of UMMS known as "Commonwealth Medicine." Neither CHCF nor "Commonwealth Medicine" is separately incorporated.

Leo Villani also worked at CHCF. Villani died in 2013, and the relator was appointed as his personal representative. In reviewing estate documents, the relator discovered that Villani had contrived a scheme to divert funds collected by CHCF to his own behoof, siphoning off nearly $4,000,000 before his death. In a series of meetings, the relator shared the details of Villani's fraud with his superiors. The relator claims that UMMS officials thereafter retaliated against him by excluding him from a meeting, denying him access to his work computer and departmental software while the scheme was being investigated, and "verbally demean[ing]" him.

In time, the relator repaired to the federal district court. He sued UMMS and Villani's estate in a qui tam action alleging (as pertinent here) violations of the FCA and its Massachusetts counterpart. The relator's complaint was originally filed under seal, and he amended it twice before the United States and Massachusetts declined to intervene. See 31 U.S.C. § 3730(b)(4)(B); Mass. Gen. Laws ch. 12, § 5C(4)(ii).

When the case was taken out from under seal, the second amended complaint was served. UMMS moved to dismiss for lack of subject matter jurisdiction and failure to state a claim. See Fed. R. Civ. P. 12(b)(1), (6). As part of his opposition to UMMS's motion, the relator cross-moved for leave to file a third amended complaint, seeking to add as defendants "Commonwealth Medicine" and a plethora of individuals (all employees or former employees of UMMS, "Commonwealth Medicine," or CHCF, sued in their individual capacities).

After a hearing, the district court (addressing the second amended complaint) dismissed the relator's FCA claims against UMMS. The court's dispositive consideration was the bedrock proposition, established by the Supreme Court in Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 787-88 (2000), that states cannot be sued in a private action under the FCA. See United States ex rel. Willette v. Univ. of Mass., 80 F. Supp. 3d 296, 299-302 (D. Mass. 2015). The court embraced the corollary proposition that whether an entity is a "state" should be determined by reference to the Eleventh Amendment arm-of-the-state test. See id. at 299. It went on to hold that this same reasoning dictated the outcome of the relator's claims against UMMS under the Massachusetts counterpart to the FCA.[1] See

_____

[1] On appeal, the relator does not challenge the district court's conclusion that the FCA and its Massachusetts counterpart

id. at 299 n.4 (citing Scannell v. Attorney Gen., 872 N.E.2d 1136, 1138 n.4 (Mass. App. Ct. 2007)). Finally, the court denied the relator's motion for leave to file a third amended complaint, concluding for a variety of reasons that the proffered complaint would be futile. See id. at 302-04.

The relator filed a notice of appeal. The notice of appeal was premature because the case was still pending against the Villani estate in the district court. We nevertheless held the appeal in abeyance while the relator sought and received partial final judgment from the district court. See Fed. R. Civ. P. 54(b). Based on the district court's Rule 54(b) certificate, the relator's appeal proceeded.

## II. ANALYSIS

In this venue, the relator seeks review of both the determination that UMMS is not amenable to suit under the FCA and the denial of leave to amend. We discuss these rulings separately.

### A. The Claims Against UMMS.

The relator's principal asseveration is that the district court erred in determining that UMMS is a state agency and, thus, exempt from the FCA. This asseveration raises an antecedent question of first impression in this circuit about the

---

are congruent in this respect. For that reason, we say nothing further about Massachusetts's version of the FCA.

appropriate test for determining whether an entity is a state agency for FCA purposes.

Some background is helpful. The FCA subjects to liability "any person" who submits a false claim to the government "for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The statute itself does not define the term "person." In Stevens, the Supreme Court filled this void: it applied the "longstanding interpretive presumption that 'person' does not include the sovereign," 529 U.S. at 780, and concluded that states are not subject to liability in actions brought by private parties under the FCA, id. at 787-88. In its analysis, the Court emphasized the "virtual coincidence of scope" between the question of "whether States can be sued" under the FCA and the question of "whether unconsenting States can be sued" in the Eleventh Amendment context. Id. at 779-80.

Though the Court did not explain how to determine whether an entity is a state agency for FCA purposes, the correspondence the Court identified has led every circuit that has confronted the question to conclude that the FCA context requires the same test as that used for determining whether an entity is an arm of the state entitled to share in Eleventh Amendment immunity. See, e.g., Kreipke v. Wayne State Univ., 807 F.3d 768, 775 (6th Cir. 2015); United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist., 739 F.3d 598, 601-02 (11th Cir.), cert. denied, 134 S. Ct. 2312 (2014); United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.,

681 F.3d 575, 579-80 (4th Cir. 2012); <u>Stoner</u> v. <u>Santa Clara Cty.</u>
<u>Office of Educ.</u>, 502 F.3d 1116, 1121-22 (9th Cir. 2007); <u>United</u>
<u>States ex rel. Sikkenga</u> v. <u>Regence BlueCross BlueShield of Utah</u>,
472 F.3d 702, 718 (10th Cir. 2006); <u>United States ex rel. Adrian</u>
v. <u>Regents of the Univ. of Cal.</u>, 363 F.3d 398, 401-02 (5th Cir.
2004).   We join this unbroken precedential chain and today hold,
as did the court below, <u>see</u> <u>Willette</u>, 80 F. Supp. 3d at 299, that
the appropriate test under the FCA for actions brought by private
parties is identical to the one we have employed in determining
whether an entity is an arm of the state for Eleventh Amendment
purposes.

It remains, of course, for us to apply this holding.[2]
We previously have articulated a two-part test for arm-of-the-
state status.   First, we determine if "the state has indicated an
intention — either explicitly by statute or implicitly through the
structure of the entity — that the entity share the state's
sovereign immunity."   <u>Redondo Constr. Corp.</u> v. <u>P.R. Highway &</u>
<u>Transp. Auth.</u>, 357 F.3d 124, 126 (1st Cir. 2004).   In the absence
of an explicit statement, an analysis of the entity's structure

---

[2] The relator concedes the applicability of the arm-of-the-
state test to all of his FCA claims, including the retaliation
claim.   Consequently, we assume, without deciding, that 31 U.S.C.
§ 3730(h) does not encompass suits against arms of the state.   <u>But</u>
<u>see</u> <u>United States ex rel. King</u> v. <u>Univ. of Tex. Health Sci. Ctr.-</u>
<u>Hous.</u>, 544 F. App'x 490, 498-99 (5th Cir. 2013) (per curiam).

requires a wide-ranging survey of the entity's relationship with the state.

While this survey is not controlled by a mechanical checklist of pertinent factors, the case law offers important clues. See, e.g., Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 44-46 (1994); Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 401-02 (1979); Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & the Caribbean Cardiovascular Ctr. Corp., 322 F.3d 56, 68 (1st Cir. 2003); Metcalf & Eddy, Inc. v. P.R. Aqueduct & Sewer Auth., 991 F.2d 935, 939-40 (1st Cir. 1993). Synthesizing these clues, we note that (as pertinent here) the factors include such things as the degree of state control over the entity, the way in which the entity is described and treated by its enabling legislation and other state statutes, how state courts have viewed the entity, the functions performed by the entity, and whether the entity is separately incorporated. See Fresenius, 322 F.3d at 62 nn.5-6, 65 n.7.

If this structural analysis is conclusive, our inquiry ends. See id. at 68. If, however, this analysis is inconclusive, "the court must proceed to the second stage and consider whether the state's treasury would be at risk in the event of an adverse judgment." Redondo Constr., 357 F.3d at 126.

We review a district court's application of the arm-of-the-state test de novo. See Fresenius, 322 F.3d at 60. A party

claiming sovereign status bears the burden of demonstrating that
it is an arm of the state. See id. at 61; Wojcik v. Mass. State
Lottery Comm'n, 300 F.3d 92, 99 (1st Cir. 2002). These same
principles attach in the FCA milieu. We review de novo a district
court's determination that an entity is a state agency and, thus,
not a "person" within the purview of the FCA; and an entity
claiming such status bears the burden of demonstrating that it is
exempt under the FCA.

   As a general matter, public universities "usually are
considered arms of the state." 13 Charles Alan Wright et al.,
Federal Practice & Procedure § 3524.2, at 325-26 (3d ed. 2008);
see id. at 326 n.42 (collecting cases). This conclusion flows
naturally from "[t]he distinctive, public-oriented role that a
state university typically plays in its state's higher education
landscape." Irizarry-Mora v. Univ. of P.R., 647 F.3d 9, 14 (1st
Cir. 2011). While arm-of-the-state status is ultimately a question
of federal law, "that federal question can be answered only after
considering the provisions of state law that define the agency's
character." Regents of the Univ. of Cal. v. Doe, 519 U.S. 425,
429 n.5 (1997). As we explain below, the statutory framework
crafted by the Massachusetts legislature lends itself to the
conclusion that the University of Massachusetts (the University),
and thus UMMS, is an arm of the state.

- 10 -

To begin, the University is not separately incorporated but, rather, is simply "a public institution of higher learning within the system of public higher education." Mass. Gen. Laws ch. 75, § 1. This public institution has several campuses, including "a medical school to be known as the University of Massachusetts medical school." Id. § 34. The overarching purpose of the University is "to provide, without discrimination, public service, research, and education programs." Id. § 2. Every feature of the statutory framework is conducive to a finding that both the University and UMMS are arms of the state.

So, too, the elaborate system of state controls over both the University and UMMS strongly indicates arm-of-the-state status. The university system is governed by a board of trustees with nineteen voting members, sixteen of whom are direct gubernatorial appointees. See id. § 1A. The governor chooses the board's chair from among these trustees, and the chair serves in that capacity at the governor's pleasure. See id. One of the remaining three members is the state's secretary of education (or the secretary's designee), see id. — and the governor appoints the secretary of education, who serves ex officio at the governor's pleasure, see id. ch. 6A, §§ 2-3. The last two members are elected student representatives. See id. ch. 75, § 1A. This substantial level of control is probative of arm-of-the-state status. See Fresenius, 322 F.3d at 68.

- 11 -

Arm-of-the-state status is also heralded by the state's close supervision over the University's budget. The board of trustees prepares an annual budget estimate, which is submitted for review by both the secretary of education and the state's board of higher education.[3]    See Mass. Gen. Laws ch. 75, § 1A. After a budget is approved through that state-centric process, the state auditor is responsible for checking University accounts. See id. § 6. Although UMMS's annual budget is reported by the trustees separately from other parts of the University "[i]n order to provide for the maximum allowable degree of fiscal independence," id. § 36, that reporting must comply with all budgetary statutes applicable to "state agenc[ies]," id. ch. 29, §§ 3-4.

The relator, alluding only to a newspaper article, suggests that UMMS's faculty is not paid primarily with taxpayer money and that state appropriations amount to only a small fraction of UMMS's gross revenue. Nothing in the record supports this assertion; and in any event, the assertion does little to aid the relator. The University's enabling act provides that the state

---

[3] The board of higher education is itself a creature of state statute. See Mass. Gen. Laws ch. 15A, § 1. Ten of the board's thirteen members are appointed by the governor (including, ex officio, the secretary of education or her designee), see id. § 4, and the board exercises a range of supervisory powers over the University, see id. § 9. The board is also charged with making proposals for approval by the secretary of education or the legislature relating to public higher education. See id.

"shall annually appropriate such sums as it deems necessary for the maintenance, operation and support of the university," including UMMS. Id. ch. 75, § 8. Nor does anything in the statutory scheme indicate that the Commonwealth is not responsible for the debts and obligations of UMMS, see Fresenius, 322 F.3d at 69; to the contrary, the Commonwealth provides a mechanism for providing funds to satisfy judgments or settlements for which UMMS is responsible, see 815 Mass. Code Regs. 5.01-.11. Finally, UMMS lacks the authority to issue bonds. See McNamara v. Honeyman, 546 N.E.2d 139, 142 (Mass. 1989); see also Irizarry-Mora, 647 F.3d at 15-16 (identifying authority to issue bonds as an important indicator pointing away from immunity).

The University, and with it UMMS, is also subject to substantial state supervision in carrying out its educational mission. Mission statements for each campus in the university system, admission standards, proposed instructional programs, and the University's five-year master plan must be submitted for approval by the secretary of education, the board of higher education, or both. See Mass. Gen. Laws ch. 75, § 1A. All property owned by the University is considered state property. See id. § 12. While the University's board of trustees is empowered to lease or convey state land for limited purposes, see id. §§ 25-26, any such transactions are subject to approval by the governor and the board of higher education, see id. § 27. Last — but surely

not least — University employees (including employees of UMMS) are designated as "employees of the commonwealth." Id. § 14.

This overwhelming statutory evidence is matched by the treatment that the University and its medical school have consistently received from state courts. The Massachusetts Supreme Judicial Court (SJC) has stated in no uncertain terms that "the University of Massachusetts and the Commonwealth are 'one and the same party, namely the Commonwealth of Massachusetts.'" Wong v. Univ. of Mass., 777 N.E.2d 161, 163 n.3 (Mass. 2002) (quoting Hannigan v. New Gamma-Delta Chapter of Kappa Sigma Frat., Inc., 327 N.E.2d 882, 883 (Mass. 1975)). Similarly, the SJC (in addressing a suit against a UMMS employee) declared that "the university is an agency of the Commonwealth and thus is a public employer." McNamara, 546 N.E.2d at 142 (citing, inter alia, the state's control over UMMS's finances and appropriations, UMMS's inability to issue bonds, and its inability to sue or be sued in its own name). Though perhaps less telling, it is also worth noting that federal district courts in Massachusetts have uniformly determined that UMMS and its affiliated programs are arms of the state. See, e.g., McGee v. UMass Correctional Health, No. 09-40120, 2010 WL 3464282, at *2-4 (D. Mass. Sept. 1, 2010); Jaundoo v. Clarke, 690 F. Supp. 2d 20, 29 (D. Mass. 2010); Ali v. Univ. of Mass. Med. Ctr., 140 F. Supp. 2d 107, 110 (D. Mass. 2001); Neo Gen Screening, Inc. v. New Engl. Newborn Screening Program,

No. 98-10394, 1998 WL 35278283, at *1-3 (D. Mass. Dec. 3, 1998),
aff'd, 187 F.3d 24 (1st Cir. 1999).

      The functions assigned to UMMS reinforce the idea of
arm-of-the-state status.  UMMS — like the University as a whole —
exists to further the critically important governmental objective
of providing higher education to the people of Massachusetts.  See
Mass. Gen. Laws ch. 75, § 2; Irizarry-Mora, 647 F.3d at 14.

      This compendium of considerations points unerringly to
the conclusion that UMMS is structured as an arm of the state and,
thus, is not a "person" subject to suit under the FCA.  For FCA
purposes, UMMS and the state are indistinguishable.

      The relator balks at this conclusion, advancing four
additional arguments.  Without exception, these arguments lack
force.

      First, the relator asserts that UMMS is not a state
agency because a Massachusetts law passed in 1997, 1997 Mass. Acts
854, "separated out [UMMS] as its own distinct legal entity."  This
assertion elevates hope over reason: the 1997 law merely
"separate[s] the operations, assets, liabilities and obligations
of the existing clinical division" of UMMS "from the commonwealth"
and creates a nonprofit corporation to house this spinoff.  Id.
at 855.  As the law's definitional section makes clear, the
"clinical division" consists only of "the clinical components of
the University of Massachusetts Worcester, including the

University of Massachusetts medical school teaching hospital, the University of Massachusetts medical school group practice, and ancillary support and operating services." Id. at 856. Given this definition, CHCF is manifestly not part of the medical school's clinical division; and nothing in the legislation supports the notion that the entire medical school operation was somehow detached from the state. Indeed, the law specifically mentions the need "for the university to maintain its medical school," id. at 855, and describes the newly created corporation as "support[ing] the commonwealth's medical school," id.

Second, the relator argues that "Commonwealth Medicine" and CHCF should be carved out of UMMS and treated differently than other parts of the University. This argument is premised, in the relator's words, on the theory that "Commonwealth Medicine" and CHCF are "for-profit" operations. But the mere fact that a governmental agency generates revenue for the state does not deprive the agency of arm-of-the-state status. See Wojcik, 300 F.3d at 99-100. The argument is especially unconvincing here because these collection efforts are at least in part mandated by statute. See 42 U.S.C. § 1396a(a)(25)(A).

Third, the relator contends that independence should be inferred from the fact that some of CHCF's activities are carried out pursuant to an interagency service agreement (ISA) between UMMS and the state's Executive Office of Health and Human Services

(EOHHS).   This contention rests on a faulty understanding of the
import of the ISA.   Under Massachusetts law, ISAs exist to enable
one governmental unit to provide funding in exchange for services
rendered by another governmental unit.   See, e.g., 815 Mass. Code
Regs. 6.02 ("The ISA is a contract between two state departments
that documents the terms and conditions of their business
relationship.").   The contract between UMMS and EOHHS is of this
genre: it merely delineates the relationship between two state
departments.[4]   So viewed, the existence of the ISA strengthens,
rather than weakens, the conclusion that UMMS is an arm of the
state.

Finally, the relator posits that this case is analogous
to Sikkenga, in which the Tenth Circuit concluded that a laboratory
affiliated with the University of Utah was not entitled to arm-
of-the-state status.   See 472 F.3d at 722.   But this case and
Sikkenga are not fair congeners.   There, the laboratory was
separately incorporated under a general business corporation
statute, id. at 718-19; could sue and be sued in its own name, id.
at 719; and entered into contracts with state agencies that were

---

[4] To be sure, statutory authorization exists for ISAs between
municipalities.   See Mass. Gen. Laws ch. 40, § 4A.   Though the
relator is correct in positing that municipalities may be subject
to FCA liability, see, e.g., Cook County v. United States ex rel.
Chandler, 538 U.S. 119, 122 (2003), that is of no consequence here:
the ISA on which the relator relies does not involve any
municipality.

essentially "commercial contracts," <u>id.</u> at 720.  Though the University of Utah was involved in the laboratory's governance, the ties that bound them together arose "as an incidence of ownership" and were found to be "several degrees removed from the direct relationship" present between the university and the state. <u>Id.</u>  When all was said and done, the laboratory possessed a level of independence appropriate to an entity designed "to enter the private sector and compete as a commercial entity." <u>Id.</u> at 721. That is not remotely comparable to the situation here.

To say more about this aspect of the matter would be pointless.  In this case, a structural analysis of the pertinent factors is altogether conclusive.  That analysis shows that UMMS is an arm of the state.[5]  We hold, therefore, that UMMS is not a "person" subject to suit under the FCA.  It follows inexorably that the district court did not err in dismissing the relator's second amended complaint against UMMS.[6]

---

[5] The district court went further: it proceeded to the second step of the analysis.  <u>See</u> <u>Willette</u>, 80 F. Supp. 3d at 301.  But where, as here, the arm-of-the-state inquiry is conclusively answered at the first step of the analysis, it is not necessary to proceed to the second step.  <u>See</u> <u>Fresenius</u>, 322 F.3d at 68.  We see no reason to do so in this case.

[6] Although this conclusion makes a full assessment of the relator's claims unnecessary, we note that the relator does not appear to have identified a single instance in which a false claim was submitted for approval or payment.  Nor has the relator provided any other details from which a court could permit discovery on the putative FCA claims.  Consequently, we doubt that the relator could satisfy the particularity standard required by

## B. Leave to Amend.

This brings us to the relator's attempt to appeal the district court's denial of his motion for leave to file a third amended complaint. At the threshold an obstacle looms. Federal courts are courts of limited jurisdiction. They cannot act in the absence of subject matter jurisdiction, and they have a sua sponte duty to confirm the existence of jurisdiction in the face of apparent jurisdictional defects. See United States v. Horn, 29 F.3d 754, 767 (1st Cir. 1994).

The touchstone of federal appellate jurisdiction is 28 U.S.C. § 1291, which confers appellate jurisdiction over "all final decisions of the district courts of the United States." A final decision is one that "disposes of all claims against all parties," Bos. Prop. Exch. Transfer Co. v. Iantosca, 720 F.3d 1, 6 (1st Cir. 2013), and there has been no final decision in this case.[7] After all, the case was still pending in the district court with respect to the relator's claims against Villani's estate both when the

_____

Federal Rule of Civil Procedure 9(b) and our cases applying that standard under the FCA. See, e.g., United States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 731-33 (1st Cir. 2007).

[7] It is hornbook law that the denial of a motion to amend is not a "final decision" within the meaning of section 1291. See, e.g., Bridges v. Dep't of Md. State Police, 441 F.3d 197, 206 (4th Cir. 2006); Soliday v. Miami County, 55 F.3d 1158, 1165 (6th Cir. 1995). Such orders are only reviewable after a final judgment in the case has been entered. See Caldwell v. Moore, 968 F.2d 595, 598 (6th Cir. 1992).

Case 4:13-cv-40066-TSH Document 103 Filed 01/27/16 Page 20 of 23

appeal was taken and when the Rule 54(b) certificate was issued. For that matter, the litigation still continues in the district court in connection with the relator's claimed entitlement to a share of the money recovered in the course of the investigation into Villani's embezzlement.    Thus, we have no appellate jurisdiction through the normal operation of section 1291.

The failure to satisfy the requirements of section 1291 is not necessarily fatal to the existence of appellate jurisdiction.    Federal Rule of Civil Procedure 54(b) provides a mechanism for immediate appellate review even if some claims are still pending in the district court.[8]

In the case at hand, the relator successfully applied for a Rule 54(b) certificate.    By means of that certificate, he secured appellate jurisdiction over the dismissal of his claims

---

[8] Rule 54(b) provides in relevant part:

> When an action presents more than one claim for relief — whether as a claim, counterclaim, crossclaim, or third-party claim — or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.

The sufficiency of a Rule 54(b) certificate "implicates the existence vel non of appellate jurisdiction." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 580 (1st Cir. 1994).    As our treatment of the arm-of-the-state question implies, we are fully satisfied with the district court's application of the factors outlined in Spiegel v. Trustees of Tufts College, 843 F.2d 38, 42-43 (1st Cir. 1988), and with its "no just reason for delay" determination.

against UMMS.  That certificate, however, did not encompass the
motion to amend.  Nor was this an oversight on the part of the
district court; as the court wrote in issuing the certificate, the
relator sought only "separate and final judgment on the dismissal
of claims against UMMS, not the Court's denial of [his] cross-
motion to amend the complaint."  The court gave the relator
precisely what he had requested, and what he requested did not
include the denial of the motion to amend.

        Rule 54(b) creates an exception to the requirement of an
all-encompassing final judgment, and we have long emphasized that
a Rule 54(b) certificate must be granted sparingly in order to
avoid upsetting the "long-settled and prudential policy against
the scattershot disposition of litigation."  Spiegel v. Trs. of
Tufts Coll., 843 F.2d 38, 42 (1st Cir. 1988).  On appellate review,
such a certificate should not be expanded beyond its four corners;
by its terms, the certificate here limited the scope of the partial
final judgment to the dismissal of the relator's claims against
UMMS.  It did not authorize an immediate appeal of the denial of
the relator's motion for leave to file a third amended complaint.
This is of decretory significance because the main purpose of that
motion was an attempt to add an array of individual defendants.
In these circumstances, we lack appellate jurisdiction over the
denial of leave to amend to add these new defendants.  The Rule
54(b) certificate simply did not include that decision within the

four corners of the partial final judgment allowed by the district
court.[9]

      It makes no difference that the parties would like us to
decide, here and now, the supportability of the denial of the
motion for leave to amend.  "Parties cannot confer subject matter
jurisdiction on either a trial or an appellate court by indolence,
oversight, acquiescence, or consent."  Horn, 29 F.3d at 768.

      We add a coda.  The proposed third amended complaint
also purposed to add "Commonwealth Medicine" as a defendant.  But
even if the Rule 54(b) certificate can be stretched to encompass
the district court's refusal to allow this particular amendment,
cf. Soliday v. Miami County, 55 F.3d 1158, 1165 (6th Cir. 1995)
(assessing denial of leave to amend with respect to a party against
whom final judgment had entered), that would not get the relator
very far.

      The district court pointed out that "Commonwealth
Medicine" is an "unincorporated subdivision[] of UMMS" and, thus,

_____

      [9] There is an open question about whether denial of a motion
to amend a complaint can ever be certified under Rule 54(b).
Compare Bridges, 441 F.3d at 207 (stating that "Rule 54(b) does
not provide the parties or the district court with the authority
to convert an order denying a motion to amend or denying
reconsideration of that motion into an order that 'adjudicates
fewer than all the claims or the rights and liabilities of fewer
than all the parties,' as required by Rule 54(b)"), with Encoder
Commc'ns, Inc. v. Telegen, Inc., 654 F.2d 198, 202 (2d Cir. 1981)
(noting that denial of leave to amend was certified as immediately
appealable, but that the affected party had not timely appealed).
We take no view on this issue.

Case 4:13-cv-40066-TSH   Document 103   Filed 01/27/16   Page 23 of 23

not separately subject to suit.  Willette, 80 F. Supp. 3d at 302.
Seen in this light, an amendment adding "Commonwealth Medicine"
would be futile.  See United States v. ITT Blackburn Co., 824 F.2d
628, 631 (8th Cir. 1987) (explaining that "an unincorporated
division cannot be sued or indicted, as it is not a legal entity").

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above,
we affirm the district court's dismissal of the claims against
UMMS.  We dismiss the relator's attempt to appeal the district
court's denial of leave to amend for want of appellate
jurisdiction.  Costs shall be taxed in favor of UMMS.


**So Ordered.**