**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**UNITED STATES OF AMERICA and COMMONWEALTH OF MASSACHUSETTS *ex rel.* MICHAEL A. WILLETTE,**

**Plaintiffs,**

**v.**

**UNIVERSITY OF MASSACHUSETTS, WORCESTER A/K/A UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL, THE ESTATE OF LEO VILLANI, and JOHN DOES,**

**Defendants.**

**CIVIL ACTION**

**NO. 4:13-CV-40066-TSH**

**MEMORANDUM AND ORDER ON MICHAEL A. WILLETTE'S MOTION FOR RELATOR'S SHARE (Docket No. 81)**

**July 11, 2016**

**HILLMAN, D.J.**

In early 2013, Michael A. Willette reported to his employer, the University of Massachusetts, Worcester (UMass), that his deceased coworker, Leo Villani, had misappropriated approximately $3.8 million that was intended for remittance to the Commonwealth's Executive Office of Health and Human Services (EOHHS). After an internal investigation and communications with EOHHS and the Medicaid Fraud Division of the Massachusetts Attorney General's Office (AGO), UMass repaid the funds to EOHHS in the spring of 2015. During the investigatory period, Willette brought suit on behalf of the United States and the Commonwealth, pursuant to the state and federal False Claims Acts, against UMass and Villani's estate, seeking to

recover the misappropriated funds. UMass and the estate of Villani have since been dismissed, and Willette moves for a relator's share of the $3.8 million that was repaid to EOHHS. For the reasons set forth below, Willette's motion (Docket No. 81) is ***denied***.

## Background

The following facts are derived from Willette's second amended complaint and the exhibits submitted by Willette, the United States, and the Commonwealth in relation to the instant motion. Michael A. Willette brought this *qui tam* False Claims Act (FCA) suit, on behalf of the United States and the Commonwealth of Massachusetts, against UMass and the estate of Leo Villani. Willette alleged that UMass and Villani violated the FCA, 31 U.S.C. §§ 3729-3733, and the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A-5O, by committing various acts of Medicaid fraud. Willette further alleged that Villani, a financial analyst in UMass's Estate Recovery Unit (ERU), had used his position to misappropriate approximately $3.8 million, the collection of which funds he had facilitated on behalf of the Commonwealth as healthcare reimbursements. Through the ERU, UMass acts as a contractor for EOHHS in the pursuit and collection of liens placed on decedents' estates for the purpose of recouping Massachusetts Health payments. ERU caseworkers negotiate settlements with decedents' estates, pursuant to which the estates make payments to the Commonwealth in exchange for release of the liens. The payments are made in the form of checks delivered to the ERU, which then remits the funds to EOHHS, keeping a percentage as compensation for the collection services. This arrangement between UMass and EOHHS is governed by an Interdepartmental Service Agreement (ISA).

Villani passed away in January of 2013. Shortly thereafter, Willette discovered the misappropriation, which had occurred over a period of several years. Willette reported the issue to Villani's manager at UMass on January 17, 2013. On January 28, 2013, he met with Executive

Vice Chancellor Joyce Murphy and disclosed the information to her. According to Murphy, the decision to repay the Commonwealth was made almost immediately after UMass officials found out about Villani's conduct, although it took time to investigate the matter and determine the appropriate method of repayment. Later in the month, additional officials at UMass were informed, including the Chancellor, Michael Collins, as well as the General Counsel and several internal auditors. On February 1, 2013, UMass's General Counsel notified the Massachusetts AGO, and Murphy discussed the matter with the Secretary of EOHHS. Willette continued to share information in aid of the investigation.

On June 5, 2013, Willette filed his first complaint in the instant *qui tam* case, on behalf of the United States against UMass and the estate of Villani. Pursuant to the FCA, this complaint was filed under seal. On July 8, 2013, he filed his first amended complaint, also under seal, in which he added the Commonwealth as a Plaintiff. Willette alleges that he was terminated from his employment at UMass three days later, on July 11, 2013. According to Associate Vice Chancellor James Healy, at some point during the summer of 2013 the Chancellor expressed the opinion that he planned to repay EOHHS in full for Villani's theft, because it was the right thing to do, and also because EOHHS was a valued business partner.

On July 29, 2013, Willette met with Assistant United States Attorney Christine Wichers and Assistant Attorney General George Zachos, who have appeared in this case as counsel for the United States and the Commonwealth, respectively. This meeting also included officials from the AGO. Willette continued to provide information and materials relating to the investigation. On October 30, 2013 Attorney Zachos, on behalf of the Medicaid Fraud Division (MFD) of the AGO, wrote to the Director of Medicaid at EOHHS:

> Having reviewed the circumstances of the theft of Medicaid funds by [UMass] employee, Leo Villani, MFD strongly recommends that

> [EOHHS] promptly notify [UMass] and the Comptroller's Office that EOHHS will seek to recoup the lost funds pursuant to an offset of future payments to [the] Commonwealth [ ], under the terms of the interagency service agreement ("ISA") between EOHHS and [UMass]. Under the terms of the ISA, [UMass] bears the risk of loss of all deliverables until received by EOHHS, and therefore, [UMass] is bound to reimburse EOHHS for all funds stolen by Mr. Villani, without regard for [UMass's] ability to recover monies from Mr. Villani's estate.

(Willette ex. P.)

According to Healy, during late 2013 and early 2014 UMass was engaged in a dialogue with EOHHS regarding the proper manner and timing for the repayment. Healy explained that there were multiple factors to consider, including whether the payment would be accompanied by a settlement agreement and a general release, and whether EOHHS potentially bore some responsibility for UMass's legal fees incurred in the process of investigating the matter and trying to collect the money for repayment. Healy also reported that there were discussions regarding "whether [UMass] should pay all of the money that was lost or whether we should just pay what we recovered," and whether UMass should "repay monies that [it] had received at the time and make other payments down the road as [it] received more monies." (Willette ex. G at 115-16.)

On January 15, 2014, Willette filed his second amended complaint in this case, under seal. On April 24, 2014, the United States and the Commonwealth filed a joint notice of election to decline to intervene pursuant to 31 U.S.C. § 3730(b)(4)(B) and Mass. Gen. Laws ch. 12, § 5C(4)(ii). The case was unsealed on April 29, 2014.

On May 9, 2014, the Chancellor wrote to the President of UMass, Robert Caret, seeking approval of a plan to repay the stolen funds through two mechanisms: 50% through a decreasing adjustment on UMass's quarterly "CMS-64" expenditure report; and 50% through a direct payment to EOHHS. According to Healy, the Chancellor advocated for this plan "because of the campus' strong business relationship with EOHHS and a general desire to make the government

whole for the stolen funds." (Willette ex. A at 3.) In his letter to the President, the Chancellor wrote:

> The Comptroller's Office, the Attorney General's Office and the Executive Office of Administration and Finance are also well aware of this matter and see its earliest resolution as essential. [UMass] concurs with the plan to repay EOHHS in full and in the manner requested and described below by EOHHS. . . . Yesterday, we received a formal notice from EOHHS's CFO, Steve Barnard, requesting that repayment of both the state and federal portions of these recoveries be made. . . . The CFO's request details the amount, timing and manner in which EOHHS would like to receive these payments . . . .

(Willette Ex. Q.) Later that day, Healy received notice of the instant *qui tam* case. This was the first that he or anyone else at UMass had heard about the lawsuit.

On May 14, 2014, the President approved the plan to repay half of the funds through a decreasing adjustment in the quarterly CMS-64 expenditure report, and the payment was made. After receiving the funds, EOHHS transferred the repayment to the United States. On June 6, 2014, UMass repaid the second half of the $3.8 million to EOHHS through a wire transfer. The payment was accompanied by a letter, which stated in part:

> Upon acceptance by EOHHS of today's wired payment from [UMass], any and all claims EOHHS may have against [UMass] related to [Villani]'s alleged misappropriation and conversion are hereby fully and completely satisfied; provided however, that nothing in this remittance statement shall be construed as an admission of liability or responsibility by [UMass], the University or their insurers.

(Docket No. 141-2 at 22.) On June 10, 2014, EOHHS acknowledged full repayment of $3,807,166.46, stating: "EOHHS releases all claims it may have against [UMass] relating to those ninety-three checks [stolen by Villani]." (Docket No. 141-12 at 2.) UMass subsequently recouped $700,000 from its insurer; $300,000 from the insurer for the bank in which Villani had deposited the misappropriated checks; and approximately $1.6 million from Villani's wife. Willette's

counsel asserts that she did not learn about UMass's payment to the Commonwealth until September of 2015.

In January of 2015, this Court granted UMass's motion to dismiss, on the ground that the FCA does not authorize *qui tam* suits by private relators against state agencies. Willette filed the instant motion for a relator's share on October 16, 2015. On October 21, 2015, he stipulated to the dismissal of the estate of Villani, after learning that the estate was insolvent. In January of 2016, the First Circuit affirmed the dismissal of UMass. *See United States v. Univ. of Massachusetts, Worcester*, 812 F.3d 35, 37 (1st Cir. 2016).[1]

This Court heard arguments on Willette's motion for a relator's share in December of 2015 and issued an order giving the parties two months to conduct limited discovery regarding the circumstances under which UMass repaid the $3.8 million to the Commonwealth and the circumstances of the Commonwealth's subsequent remittance to the United States. The purpose of this discovery period was to shed light on the issue of whether Willette may be entitled to a relator's share pursuant to the "alternate remedy" provision of the FCA, 31 U.S.C. § 3730(c)(5). After completion of discovery, this Court heard further arguments on June 20, 2016.

## Legal Framework

The False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, was meant to be an "expansive" statute, reaching "all types of fraud, without qualification, that might result in financial loss to the Government." *Cook Cnty., Ill. v. United States ex rel. Chandler,* 538 U.S. 119, 129 (2003) (quoting *United States v. Neifert—White Co.,* 390 U.S. 228, 232 (1968)). The most commonly used subsection of the FCA "imposes liability on any person who 'knowingly presents . . . a false or fraudulent claim for payment or approval,' 31 U.S.C. § 3729(a)(1)(A), 'to an officer or employee

[1] Willette has since filed a petition for a writ of certiorari with the Supreme Court.

of the United States,' 3729(b)(2)(A)(i)." *Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter*, 135 S. Ct. 1970, 1973-74, (2015). The FCA also imposes liability on a person who "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property." § 3729(a)(1)(D). This is the subsection at issue in the instant case in relation to Villani's conduct.

The government may initiate litigation to enforce the FCA, or a private party—the "relator"—can bring a civil *qui tam* action in the government's name. § 3730(a), (b)(1). In a *qui tam* suit, after the relator files a complaint and serves the United States with a copy, the United States may choose to "proceed with the action, in which case the action shall be conducted by the Government," or it may "notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action." § 3730(b)(4)(A)-(B). Regardless of whether the United States decides to proceed, it retains the right to dismiss the action or settle the case. § 3730(c)(2)(A)-(B).

As an incentive for exposing fraud, the relator is entitled to share in the proceeds of a successful FCA suit. If the government chooses to proceed with an action brought by a relator, the relator is generally entitled to receive "at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim." § 3730(d)(1). If the government does not proceed with the action, the relator is entitled to "not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement," plus fees and costs. § 3730(d)(2). Furthermore, section 3730(c)(5)—the "alternate remedy" provision—provides:

> [T]he Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such

> proceeding as such person would have had if the action had continued under this section.

Massachusetts also has an FCA statute, Mass. Gen. Laws ch. 12, § 5A-O (MFCA). The MFCA was modeled on the FCA, and Massachusetts courts look to cases interpreting the federal statute for guidance in construing the MFCA. *Scannell v. Attorney Gen.*, 872 N.E.2d 1136, 1138 n.4 (Mass. App. Ct. 2007).[2]

**Discussion**

The dispositive issue in this case is whether the Commonwealth and/or the United States pursued an alternate remedy pursuant to 31 U.S.C. § 3730(c)(5) and/or Mass. Gen. Laws ch. 12, § 5E. Willette argues that the alternate remedy provision of the FCA was intended to protect whistleblowers, and that it should be broadly interpreted to include all alternative methods of recouping losses caused by fraud. Willette notes that he was the first to report the fraud to UMass; he provided useful information during the investigation; and the governments ultimately recovered funds to compensate for the fraudulent activity. The United States and the Commonwealth do not dispute these facts.

The United States and the Commonwealth have filed a joint opposition, in which they assert three arguments. First, they argue that Willette is not entitled to a relator's share because he did not state a valid FCA claim against the estate of Villani. As noted above, the only FCA

[2] The alternate remedy provision of the MFCA provides in pertinent part:

> Notwithstanding the provisions of section 5C, the attorney general may elect to pursue its claim through any alternate remedy available to the attorney general, including any administrative proceeding, to determine a civil penalty. If any such alternate remedy is pursued in another proceeding, a relator shall have the same rights in such proceeding as said relator would have had if the action had continued under said section 5C.

Mass. Gen. Laws ch. 12, § 5E.

provision that potentially encompasses Villani's conduct is 31 U.S.C. § 3729(a)(1)(D). In his complaint, Willette described Villani's conduct but did not cite to section 3729(a)(1)(D).

Second, the United States and the Commonwealth argue that the motion should be denied because neither government pursued an alternate remedy against, or recovered any funds from, Villani's estate. They assert that, in order for a settlement to constitute an alternate remedy, it must result from a proceeding in which the government asserts the same claims that the relater asserted in the *qui tam* action. Here, Willette asserted claims against Villani, but neither government contacted a representative of the estate to discuss repayment of the funds. The repayment and corresponding negotiations pertained to UMass only.

Third, the United States and the Commonwealth argue that the motion should be denied because they did not pursue an alternate remedy against UMass. They assert that the United States Attorney's Office did not learn until September of 2015 that UMass had repaid the Commonwealth, and it was not until February of 2016 that they learned that 50% of this money had been remitted to the federal government. Regarding the Commonwealth, they argue that UMass recognized its obligation to repay the stolen funds to EOHHS immediately after learning about the theft and decided to make the repayment long before learning about Willette's *qui tam* FCA suit.

I need not reach the governments' first argument, because I find no indication that either the Commonwealth or the United States pursued an alternate remedy against UMass or the estate of Villani. It is undisputed that Willette exposed Villani's theft and was the first to report it to UMass. However, the fact that Willette was the original source of the information is not sufficient to entitle him to collect a portion of the proceeds. *See Rille v. PricewaterhouseCoopers LLP*, 803 F.3d 368, 374 (8th Cir. 2015) (rejecting the theory that a causal connection between the relator's

claim and a later settlement is sufficient to allow recovery of a relator's share). As set forth above, the factual record developed during discovery reveals that UMass reported the issue to the Commonwealth immediately; an investigation ensued; UMass voluntarily agreed to reimburse the Commonwealth; and the Commonwealth repaid a portion of the funds to the United States. There was no need for an alternate remedy, because UMass began investigating the fraud immediately and never exhibited an intent to withhold repayment of the stolen funds. UMass and the Commonwealth engaged in discussions regarding the appropriate manner and timing of repayment, but there is no evidence that UMass's actions were motivated by Willette's lawsuit, or that the Commonwealth or the United States took affirmative action to enforce the repayment. Accordingly, although Willette unquestionably did the honorable thing by alerting UMass of Villani's misconduct, he is not entitled to a share of the proceeds under the FCA or MFCA.

## Conclusion

For the reasons set forth above, Willette's motion for relator's share (Docket No. 81) is ***denied***.

**SO ORDERED.**

**/s/ *Timothy S. Hillman***
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**